One Ingham Regional Medical Center v. United States It please the court, Diane Cooley for Plaintiff's Appellants. Do I understand what claims we have here before us? As I understand it, and correct me if I'm mistaken about this, you're saying with respect to the hospitals other than Ingham that there's a statutory claim because the Department of  And the other claim is that with respect to Ingham that the release leads to breach of contract claims by Ingham. Is that a fair statement of what we have before us? Yes, Your Honor. And I thank you and I apologize. Thank you for bringing that point up because in my questions presented, I made a mistake. And in the third question presented, I limited it to Ingham. And in fact, as you point out, the money mandating claim, which is the third question presented, is actually not directed to Ingham but rather to the other four plaintiffs. The breach of the release claim and the mutual mistake claims go to Ingham only. Okay. And with respect to the breach of the release claim, I understand the theory that the radiology reimbursement wasn't in accordance with the formula that was specified. But just put that to one side. As I understand it also, there's a mutual mistake claim saying that the release of the non-radiology claims should be ignored or voided or whatever because there was a mutual mistake as to what the situation was with respect to those claims, correct? Correct. Okay. If we were to rule against you on the statutory claim, why would we need to reach the mutual mistake claim? Isn't the mutual mistake claim just a claim which allows Ingham to pursue a statutory claim since there wouldn't have been any release of the non-radiology claims? Do you understand what I'm saying? I do. I do understand what you're saying. If you find that the statute did not require the Department of Defense to reimburse the hospitals using a reimbursement rule for hospitals, the pre-OPPS reimbursement rules for hospitals, then I believe you're correct that then there would be no claim for mistake because those services would not be reimbursable in any event. Okay. Just to be clear. I'm a little confused now. I thought you had said, maybe I misheard it, that the breach of contract and Comp 3 went to Ingham and only Ingham. And that the final issue with respect to the statutory provisions went to all hospitals other than Ingham. Correct. The money mandating claim goes to all hospitals with the exception of Ingham because those hospitals did not sign a release, did not participate, under the discretionary payment program, were never paid, never signed a release. But I think the point I was trying to make, and I thought you agreed with it, is that with respect to the non-radiology claims relating to the release, we don't have to reach the mutual mistake claim. That is the issue of whether the release is effective as to the non-radiology claims. If we rule against you on the statutory claims because the only effect of succeeding on the mutual mistake argument as to the non-radiology claims is that you have a statutory claim that remains. I think that's correct. I'm a little confused, frankly, but I think you're correct in that the claim under the statute is that the regulation failed to pay as the statute directed. And it failed with regard to all outpatient services because it didn't pay them like hospitals. And if we disagree with you on that, then it doesn't matter whether this release contract included, properly included, or excluded them because you can't say a claim whatsoever if it was on the statutory construction argument. With regard to the other services other than radiology. Correct. So in that case, your view is even if the government could have won on the radiology because the interpretation of the statute was right, they entered into a contract with you to actually provide for specific payment for the radiology service, provided specific steps, and that even if there's no underlying statutory right, there's now a contractual right to relief on that. That is correct. That is absolutely correct. Could you start maybe with that clarification? That was very helpful. Tell us why the statute should be read your way. Because I understand that you're not contending that use of the OPS methodology was practicable, right? That is correct. We do not dispute OPPS was not practicable to adopt until 2009 for TRICARE. Okay. So with that understanding, then, how does the statute help you? How is the statute violated? The statute is clear. The language of the statute requires DOD to emulate reimbursement rules for hospitals to the extent practicable when it implements a rule to pay for hospital services. But how does that suggest that if a current rule isn't practicable, you should go back to the earlier rule? It's a matter of how this Court is going to construe the phrase to the extent practicable. What we contend, and the way that the facts show DOD always construed the statute, was it's a matter of degree. It's a continuum of obligations. So if they weren't able, if DOD was not able to fully adopt the then-existing rule, OPPS, it was nevertheless required to adopt a rule for hospitals. And the statute says that. The statute is explicit that hospitals get paid like hospitals. TRICARE hospitals get paid like Medicare hospitals. The phrase provider of services is limited to hospitals. But what we contend is there's a continuum of obligations where if you can't adopt this rule in whole, you have to come as close as you can using a Medicare rule. You can't go off the reservation, so to speak, and pick a rule that is contrary to the entire reimbursement scheme. Medicare has never... How do we know that, and who's in the best position to judge that? I mean, they adopted a rule that they said is their best guess at what they can do. I don't want to use the word guess, but you know what I mean. Their best attempt at what they can do until something else becomes more practicable, don't they get some kind of deference there unless it's completely inconsistent with the statute? And I know it's a... What your point is that they've adopted a rule that doesn't go to hospitals, it goes to individuals, but couldn't it be the case that the individual rule, even if it's not perfect, is the most practical at that point in time? No. The fact that they... Why not? That it was the most practical at the time? Because it has to be both practicable and for hospitals. It can't just be practicable. It has to be for hospitals. Not just because the statute actually says it has to be for hospitals, but the entire Medicare and TRICARE reimbursement scheme is based upon reimbursing based on the site of services. Every regulation relating to reimbursement distinguishes between the site of service. This is the only one ever that didn't. And there's a reason for that. There's not a reason why it didn't, there's a reason why they all do. And that's because treatment in a hospital is fundamentally different and costs more than treatment in a physician's office. So if I understand your argument, what you're saying is it might not have been practical, it wasn't practical to address the approach that Medicare was using, but that they were obligated to adopt a Medicare principle, which was that hospitals and individual doctors should not be treated the same way. That is exactly correct, Your Honor. And so we don't have to talk about deference or discretion. It's error as a matter of law when they adopted a private rule as opposed to a hospital rule. I think we can still talk about deference, and whether you give that deference or not, it's such a departure from every other... But see, this makes me uneasy, because if we're talking about deference, and even if you suggest that the statute says hospitals should be treated differently, if on the record they say we've looked at all the rules possible, and the only one we can use now until we can transition to this other system is the rule we adopted, even if it's not a perfect fit, if deference is in play, why don't we give them deference? Because, first of all, Your Honor, that is not what they said. When they implemented this rule, they said, well, we can't implement OPPS right now, so we're going to implement this rule. They never said that they looked at the universe of rules, of hospital-based rules, and that this was the only one, nor could they say that, because this isn't a hospital-based rule. So what they didn't do was they didn't look at other practicable methodologies, and we know that pre-OPPS methodologies for outpatient services were practical, and we know that because they turned around and used them to reimburse for the radiology shortfall. So there was no reason why they couldn't have gone to that blended rate in the first place. So if we look at what actually happened in the discretionary payment process, that is the best evidence of what was practicable. They turned around and said, oh, CMAQ, we did a whole study to compare, not how CMAQ paid versus how OPPS paid, which, by the way, they could have done, because it was 2010 and they were using OPPS. So they could easily have looked at CMAQ versus OPPS, but they didn't. So they looked at CMAQ compared to pre-OPPS rules, which they described as rules providing fair payment for federal health care, which CMAQ, quote, was intended to emulate. I think I understand your argument, and I don't mean to interrupt you, but before you're almost into your rebuttal time, I want to ask you about the release issue, because it seems to me that there are two ways of looking at this, this release issue. One of them favors you and one of them favors the government. I want to get your reaction. So if you look at this whole series of events as the government recognizing that they've underpaid, here, we're going to set up this essentially claim resolution process. At the end of it, we'll give you a number. If you agree with that number, accept it, sign a release, we're done. That seems to me to be in favor of a pretty broad release. We're talking about income now, obviously. They accepted that number, they're out. The other way of looking at it, which I think is your way of looking at it, is this was a settlement of statutory claims, essentially, and that the settlement was not just we'll give you a number, you accept it. It was the settlement gives us these various steps, and upon completion of every single one of those steps, the release will become effective. And since the government didn't complete some of those steps, they breached those and the release is not effective. Do I have the gist of that right? Why isn't, the government can answer the other side of the question, but why isn't the way of looking at this as at the end of the day, you did get a number, and with kind of full knowledge that this is the number and there's a release out there, you signed it. Why isn't that a good way of looking at the release would entitle the government to prevail on that? I think that that way of looking at it has a lot of surface appeal, and I agree with you, it's a simple way of saying you had a number, you agreed to the number, you signed the release, it's over. But the contract documents themselves said, we're going to give you a number calculated in this manner. And then they didn't calculate in that manner, and we didn't know that. So the release itself actually doesn't have a number in it. On the contrary... Yeah, but the release does call out any claims known or unknown. So why wouldn't that cover? You didn't know that the government really didn't follow accurately what they said they were going to do, but you've released them from any unknown, but you found that out later. But that's why we have in the release unknown claims that they're released from. What I would say, Your Honor, is there was a prior material breach. And the way this was construed by the Court of Federal Claims, she said, you've alleged a breach by the government, but I'm sorry you've released that claim. Well, now the contract, which is the release... You can't read a release to release a claim based on a breach of the release. Thank you, Your Honor. That was my argument, which is that there's been a prior material breach, and so now the breached contract is being enforced only against the non-breaching party, which to me turns contract law on its head. Before you sit down, I have one other question. There's the allegation here that the government didn't properly calculate this. Is it not the case that the documentation that showed the improper calculation by the government, in your view, were documents that were in your client's possession? Do you mean the claims, the claim data itself, the raw claim data itself? Well, I'm talking about the radiology claim, and I'm saying you say they didn't calculate the amounts owed properly. But the documentation that the government was relying on in making those calculations was your documentation, right? The problem is they didn't rely on our documentation, no. They specifically said, don't provide us with the claims data, we have it. But it was data that you provided to them, right? Over the years, we submitted claims for reimbursement, and there was an agreement that we're going to include subset A and we're going to exclude subset B. And what they did was they systematically excluded certain claims that were in subset A. Okay, so if you thought they gave you a spreadsheet for Hingham, you had the documentation that would have allowed you to check the accuracy of that calculation, correct? That is not in the record. For purposes of this argument, I will say I will agree that we had that information. It's eight years old by the time this is happening. So I'm going to agree for purposes of the argument that we have it, and we can go from there. Okay, all right. So if we had it, my point is the fact that we had it didn't require us to do it. The government said, we're going to do this. And we had a right to rely on that representation that came on DOD letterhead that said, don't give us data. We have it, and we're going to use it in this manner. Okay. We'll be still at two minutes at the bottom. Thank you. Thank you. May it please the court. This case arises out of the government's discretionary. It seems to me this release is extremely badly drafted, which is why I suppose we're here today. And normally in a release you say, okay, we're giving you so much money, and here's the number, and you release your claims. For some reason, which escapes me, the release was not drafted that way. Instead it said, you will release your claims in exchange for an agreement that we will compute the amount according to this schedule, and we'll give you the spreadsheet, and we'll give you the number. Why should we interpret that as being a release that precludes them from questioning the accuracy of the calculation? Well, to answer the question, the last part of what you said, the step number eight in the nine-step process, not only called for, but actually required the hospitals to do just that. If they thought there were errors in the calculation at all or had any anticipation of that, they were entitled to, in fact, the government encouraged them to ask questions about the calculations. They were provided all the calculations on the worksheet that was given to them. I understand, and they could have checked it, but I find it extremely strange that the release didn't say, by taking this amount of money, you release the claims. I mean, that's just a very, very strange release. Well, they knew the amount of money that they were going to get prior to executing the release. But most releases say, here's, you know, in exchange for $2 million, we release our claims. Why isn't the release drafted that way? I can't answer your question directly, Ron, in terms of the way that this particular release was drafted. But in terms of the information the hospitals had, hospitals knew prior to executing the release the amount of money, if any, that they would receive in this discretionary payment process. How does that matter if what they were entitled to was not just a specific amount of money, but was a number of different steps, and if the government didn't give all those steps in exchange, then the government breached the release agreement? The government didn't breach the release agreement, Your Honor, and the government did follow all the steps in the notice process. Well, that's a merits issue, though, and the Court of Federal Claims refused to get there because she found the release barred those claims. So I don't think that's a very useful answer. Let me give you a hypothetical, because I find these release language here a little bit confusing. But let's say we have an employment case where somebody is removed and files suit, and rather than litigating suit, the agency and the employee agree to a three-part relief. The employee gets reinstated, all the adverse references get removed from their files, and they get a sum of money in exchange for all of this. And they sign that, they get the money, they cash the check, they later find out, and they get reinstated, but they later find out that the agency refused to remove the adverse information in the file. Isn't that a breach of that settlement agreement? And doesn't that preclude the agency from relying on the release to bar the initial challenge to that adverse action? In that instance, perhaps that might be true, Your Honor, but not in this instance. But why is it any different here? Because it's the same thing. This was not a simple bargain for pay us X amount of money and we'll release you from claims. It was a bargain for performance of all these different steps, which included doing certain things under certain methodologies. And since they at least made an allegation, which we have to accept is true for a motion to dismiss, that you didn't do that, then there's a claim that you have breached the agreement and they're excused from being bound by the release. If, Your Honor, I'll explain it this way. If I'm seeing this scenario you set up correctly, Your Honor, it sounds like there were issues in the employment and the person, instead of litigating, signed a settlement agreement that said they would do X, Y, and Z and be reassessed later, something to that effect. Well, that wasn't part of my hypothetical. They just got their job back and they got money and blah, blah, blah. But it doesn't really matter. Okay, no. But it's different. But I think what Judge Hughes is asking you, the Court of Federal Claims said that claims for breach of the release were surrendered by the release. That can't be right. That's got to be wrong. Well, the nature of the rule... Wait. If there's a release that imposes an obligation, as in Judge Hughes' hypothetical, to do something and the government doesn't do it, it's liable. It can't say, oh, well, you know, any claims based on a breach of the release were released by the release. That makes no sense, right? But, Your Honor, you can't eviscerate the language of the actual release. It makes no sense, right? The release is releasing their statutory claims. It's not releasing any claims for a breach of the release agreement itself. The release is, well, in order to say that there is a breach of the release, you'd have to show something like fraud or duress, which they did not allege, or you'd have to show that there's a breach of the state. You're talking about the merits again. We're not talking about the merits. I think that you're not arguing that you didn't argue that they failed to state a claim, or at least the Court of Federal Claims did not find that they failed to state a claim for breach of the release agreement. She found the opposite. But then she went on and inexplicably found that that's still entitled you to enforce the release even when you breached the release agreement. Going back to the scenario you brought up, Your Honor, this is a lot like the Lindt case, which the plaintiffs cite. But there's a difference between a release and a settlement agreement because once you sign a release, the way that a release works is that's it, you're done, unless a certain condition needs to happen. But it can't surrender claims for a breach of the release agreement. That's not the purpose of the release. But in this instance, once the release... Your argument is there's no breach. We understand that. But if there was a breach of the release, suppose you say, in exchange for this release, we'll pay you $100,000. And you don't pay the $100,000. You can't very well say, oh, well, you released the claim with respect to the $100,000, right? Take my hypothetical. We agreed to pay you $100,000 in exchange for the release of these claims. And the government doesn't pay the $100,000. You can sue for breach of the release agreement, right? That would be true, Your Honor. But in this instance, it's very different because prior to signing the release, Hospital Ingram knew the amount of money it would receive. That's a different argument. The problem is they didn't just... The release wasn't conditioned on a specific amount of money. The release was conditioned on the government doing a variety of things. And they were entitled to fulfillment of all those things, not just the payment of money because of the way you worded the release. The Court of Federal Claims understood that and mentioned those kinds of things in its decision. But the Court of Federal Claims found, correctly, we believe, that the release was an honest face. You can't eviscerate the language of the release itself. It was unambiguous and a release... If you breach the release, if there was a prior breach by the government, how can a release excuse a breach by the government of the agreement itself? If the plaintiffs had alleged mutual mistake of fact, that's a possibility. Or if the plaintiffs had alleged that there was duress or fraud, which they didn't allege in this instance. They alleged breach. And the Court of Federal Claims found that that was a plausible claim. But the Court of Federal Claims also... I'm tired of discussing whether there was a breach or not. Assume, for purposes of all my questions, that you breached two or three provisions of this agreement about how to calculate these damages. I know you don't think so, but assume you did. How can you possibly enforce a release when they were entitled to proper performance under those provisions? Because the release, with its unambiguous language, very clearly stated that the hospital, in executing the release, which they did, would be required to extinguish all claims following. All of the claims prior. All of the things that happened prior to that. That would be extinguished upon executing the release. And the condition of the government... If that's your answer, then your answer to Judge Dykes' hypothetical about the $100,000 should be the same. Because once they executed the release, they extinguished all claims, including claims for breach of that. And so if they didn't get the $100,000, they'd breach it. That's nonsensical. But that's not the same, Your Honor. That's not the same. It is, though. That's the problem. You're trying to say that it's different because there's a firm dollar amount there that didn't get paid. But you didn't structure this agreement that way. You structured it in, not only are you entitled to a dollar amount, you're entitled to specific performance of these three or four obligations. And they alleged, and the court found, that they at least made a plausible claim that you didn't perform on some of those things. It's exactly equivalent to not paying a certain amount of money. I don't quite see it the same way Your Honor is presenting, but I understand your point, Your Honor. Our argument remains that once they executed the release, other than getting the check, which they knew they were going to get based upon the worksheet, which they knew prior to the release, they did relinquish all their rights for any of the other claims. Because of the nature of the release being so broad. Can we move on to the statutory claims? Yes, Your Honor. It seems to me that, in fact, I'm a little confused, but it seems to me that the government, by agreeing that at least some of these calculations were improper, has provided enough evidence to get past a motion to dismiss, on their part, that you were not following the statute and making these payments as practical as Medicare, because the statute required you to pay hospital rates and not individual rates. The statute itself does not require the government to pay hospital rates, Your Honor. And, in fact, the statute stated that the government was required to implement the outpatient prospective payment system. That was all that the statute required, and that was what was done by Medicare. It didn't require the government to implement any particular pre-ops methodology, and that's what the plaintiffs wanted. And they wanted it... This whole thing, Your Honor, is about overhead costs, because the government was moving in the direction of not paying all of the hospital overhead costs, and that's the issue. So the government did not implement a Medicare, a blended rate methodology in the interim, final, and final rules. What they said is they were going to pay for the services. They were not paying for the location, the site of the services. That was the rationale and the basis upon which they implemented the CNAP. I get that, but then they seem to say that, oh, well, maybe that's actually wrong, and that's why we're going to give you additional amounts for radiology. Well, Your Honor, they weren't saying it was wrong. Plaintiffs would couch it that way and have you believe that. But they understood that the hospital... Again, we're on a motion to dismiss, so we have to take their claims in the best light optional. I understand, Your Honor. So if they have a facial allegation that the government has conceded they weren't paying properly, maybe you win on the merits at the end of the day, but how is that proper under a motion to dismiss? I understand your point, Your Honor. Let's assume for the purposes of this argument that they are correct in that regard. The government used a blended rate in the interim and final rules because they wanted to provide additional overhead costs that the hospitals alleged they had not received in the past. That was the reason for that. But that doesn't necessarily mean that in doing that the hospitals believe that that was the proper rate that they should have used for the interim, final, and final rules. It just means it's what they're using in this instance to resolve the issues. They wanted to go forward when the op system was implemented with a clean slate so that the hospitals weren't challenging them. And the challenging is this overhead rate for years in other courts besides here. Not to their satisfaction, they keep challenging it. And the government wanted to begin the op system with a clean slate so we start all over again, there's no challenge to that. And they wanted to, because they valued their relationship with the hospitals, they wanted to come up with something that could give them a little bit more money. They weren't offering them any more money for all of the outpatient services, only for one, radiology, that's it. Not for every one of them. Just for one particular type of service that was provided. Can I ask you a question about the statute? Yes, sir. The statute was amended, the statute that we're relying on, was enacted in 2001. Is that correct? 2000, 2001, you're on, yes. But at the time of the enactment of the statute, ops was not the exclusive Medicare approach. In fact, they were transitioning from the old approach to the new approach. So when the statute refers to the Medicare approach, couldn't it be construed as referring not only to ops but to the preexisting approach as well, since that was still in effect? Well, it could, Your Honor, but the CMAQ actually uses elements of ops. The difference between the CMAQ and the blended rate is in the overhead charges. But what the government wanted to pay when they implemented the interim final and final rules, excuse me, Your Honor, was the services provided. Doctors provide services in the hospitals. Doctors provide services in a clinic and other sites. So they wanted to pay for the services. They were interested in reducing the amount they get paid for this location. And the CMAQ, they used the technical component of the CMAQ charge, which is actually Medicare elements in there. They're just not the Medicare elements the plaintiffs wanted, Your Honor. Can I just follow up on a couple of things? This case is very complicated in terms of what we do, and there's a lot of moving pieces. But let's assume we disagree with you on the release and that they properly stated a breach, but that we agree with you on the statutory claims so that all that's at issue is the breach of the release agreement. Their damages are going to be what? They get a recalculation under the proper methodology in the settlement agreement. They don't get to go back and argue about statutory rights. Well, no, they wouldn't. If we disagree with them on statutory rights. Now, let me twist it a little bit. Let's assume we actually agree with them on statutory rights, too. I'm talking about Inga now, not the non-release people. If we agree with them on both issues, does the fact that you breached the release agreement now mean that their damages could include the statutory rights as well to the non-radiology? I'm a little confused about what you mean by statutory rights, Your Honor. I don't understand. You're saying that if you agree that... The non-radiology stuff. Oh, the other outpatient services. Let me just be clear. What I'm saying is we're going to find you breached your release agreement, and therefore the release is not enforceable against them. Can Inga only sue for breach of that agreement, or does that mean since there's no release enforceable against them for anything, that they can now sue for the statutory rights, too? Well, anybody... Let's see, but you're talking about the statutory rights and the amount of payment. If you say that... It seems to me that they can. But I just want to make sure that you're not saying that the release is still effective as to the non-radiology claims, because there is only a partial breach or something like that. This is very complicated for me. I'm not sure I understand your point, Your Honor. I'm sorry. You're asking me... I think the point has to do with whether they've repudiated the agreement and can treat it as though it doesn't exist, which I think would be an option. But as I understand it, that's not an option that they've exercised. In other words, they're attempting to sue under the release and to keep the release still in effect but say that you breached the release. That's their argument, yes, Your Honor. So in terms of the statutory effect, then it would seem like the hospitals that did not sign the release would be the hospitals that would come under the statutory effect. That's how I would interpret it. But the ones that signed it are still bound by the agreement and only get to seek breach damages for the agreement, can't repudiate it entirely and seek statutory rights. I don't see how, Your Honor. Well, I think the way I would assume they're going to argue it is that once you breach the agreement, the release of claims is no longer enforceable for any reason whatsoever. They haven't argued it that way, and maybe it's something the Court of Federal Claims should resolve because there's all these notions of partial breach or complete breach and things like that. I was just curious if you had an answer, but it clearly hasn't been briefed that way. It hasn't been briefed that way, Your Honor. For the reasons set forth in our brief and discussion today, Your Honor, we respectfully request that you affirm the decision of the Court of Federal Claims. Thank you. Thank you. I'd just like to... You haven't treated the government's breach as a total breach which allows you to repudiate the agreement, right? We haven't briefed that, as has been pointed out. No, we haven't ever contended it. In fact, you're suing on the release as though it still existed. That's correct, and I think the point that was made, which is that I think that would be a matter for the Court of Federal Claims to determine the scope of what happens once we go back. I don't understand how you can repudiate an agreement that you're trying to enforce. I mean, I think you've made an election to enforce the agreement, and that's binding on you. I don't see how you can argue otherwise. In other words, to pursue your statutory claims with respect to the non-radiology, I think you'd have to win on your mutual mistake argument. I think that's correct. I did want to address counsel said... Can I just be clear? Yes. I think this is important because I know in this case we're only talking about Ingham as the only case that signed the release, but I understand this is a pediatric class accident. Correct. There are likely a lot of other hospitals that did sign the release, so the amount of damages that differ between the breach of the release agreement versus reverting back to full statutory rights could be significant. Yes. And so if you haven't kind of preserved that argument as to partial or total breach, I think it's important. It may be that we shouldn't decide that, but it's not an insignificant question. It is not an insignificant question. And I agree with you, Judge Hughes, that if the contract has been breached, it's been breached, and one remedy would be to void the contract. But I didn't see that. It seems like you're seeking breach damages. Correct. Okay. I would like to just very quickly say a point was raised about radiology, and if no other claim in this case survives, I firmly believe that a case for outpatient radiology under the statute for every hospital that did not sign the release has to exist because DOD admitted that at least with respect to radiology, that their chosen rule, CMAQ, did not emulate Medicare, quote, as well as it could have. That is an admission, and their entire process, pursuant to which they distributed $98 million, admits that the regulation failed to comply with the statute. So for all those hospitals that didn't sign the release, there has to be a radiology claim under the money mandate. Okay. Thank you. We thank both sides. The case is submitted. That concludes our proceedings for this morning. All rise. Thank you. And I will record this adjournment until tomorrow morning at 10 a.m.